IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| AARON V. PERRY, et al., ) | |
| ) | |
| Plaintiffs, ) | CIVIL ACTION |
| v. ) | |
| ) | No. 24-1183-KHV |
| KANSAS STAR CASINO, LLC, et al., ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

### MEMORANDUM AND ORDER

Aaron V. Perry, individually and on behalf of others similarly situated, filed suit against various casinos owned and operated by Boyd Gaming Corporation. On October 31, 2024, the Court conditionally certified a collective defined as follows: All persons employed as table games dealers and included within a tip pooling arrangement at a casino property operated by a defendant at any time from January 1, 2022 to March 8, 2024. See Order (Doc. #5). Plaintiff sues under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq. This matter is before the Court on Plaintiff's Unopposed Motion For Approval Of FLSA Collective Action Settlement (Doc. #40) filed June 27, 2025, which also seeks final collective certification. For reasons stated below, the Court sustains in part and overrules in part plaintiff's motion.

### Factual Background

**I.      Lawsuit And Claims**

Aaron Perry worked as a table games dealer (i.e. a casino employee who deals games like blackjack, craps and roulette) earning a sub-minimum wage plus tips at Kansas Star Casino, LLC near Wichita, Kansas. Boyd Gaming Corporation owns and operates Kansas Star Casino and the other defendants: Par-A-Dice Gaming Corporation, Blue Chip Casino, LLC, Diamond Jo Worth, LLC, Belle of Orleans, L.L.C., Red River Entertainment of Shreveport, L.L.C., Treasure Chest

Casino, L.L.C., Boyd Tunica, Inc. and Valley Forge Convention Center Partners, LLC.

Defendants required plaintiff and other dealers to pool their tips with their fellow dealers at each respective casino. Plaintiff alleges that defendants violated the FLSA because they included a "dual job" position in the tip pool for purposes of paying Paid Time Off ("PTO"). Specifically, plaintiff alleges that the Dual Rate Supervisor position—a role where an individual works as both a dealer and a floor supervisor—was improperly paid PTO from the dealer tip pool that the individual earned while working in the non-tipped, managerial floor supervisor capacity.

On October 11, 2024, plaintiff filed suit, alleging that defendants' tip pooling arrangements at the nine casinos violated the FLSA. Plaintiff alleged that defendants maintained unlawful, mandatory tip pooling arrangements for its table games dealers because they (1) failed to limit participation in the tip pool to tipped employees as required by the FLSA, i.e. employees who customarily and regularly receive tips, and (2) violated the FLSA because employers kept tips received by employees so that managers and supervisors received a portion of the employees' tips.

Plaintiff sought to represent a collective consisting of other table games dealers required to pool their tips at the casinos which Boyd Gaming owned and operated. Under 29 U.S.C. § 216(b), the Court conditionally certified a collective defined as follows: All persons employed as table games dealers and included within a tip pooling arrangement at a casino property operated by a defendant at any time from January 1, 2022 to March 8, 2024.[1] See Order (Doc. #5).

In a prior lawsuit, the Honorable Daniel D. Crabtree also certified a tip pool collective of dealers at Boyd Gaming casinos. See James v. Boyd Gaming Corp., 522 F. Supp. 3d 892 (D. Kan. 2021). The Stueve Siegel Hanson law firm and the McClelland Law Firm—counsel for plaintiffs

---

[1] On March 8, 2024, defendants ceased paying PTO to Dual Rate Supervisors from dealer tip pools.

in this case—also represented plaintiffs in James. In James, the settlement agreement included a release of all claims through December 31, 2021. After the settlement in James, plaintiffs' counsel learned that at nine of Boyd Gaming's casinos, defendants continued the same tip pooling practice which plaintiffs challenged in James. This action essentially piggybacks on the claims which plaintiffs raised in James but for a different period, i.e. January 1, 2022 through March 8, 2024.

**II.     Settlement Agreement**

Plaintiffs and defendants have reached a collective action settlement which is limited to the 507 members of the tip pool who returned consent forms to join the collective action which the Court conditionally certified. Under the agreement, defendants will pay $981,000 into a Qualified Settlement Fund that will (1) make settlement payments to collective members; (2) pay the cost of notice and settlement administration ($19,956, which includes $8,999 for administering the collective notice process) to Analytics Consulting, LLC; (3) pay a proposed service award of $10,000 to Perry; and (4) reimburse plaintiffs' counsel's litigation expenses of $1,428.06.

The Qualified Settlement Fund represents 77 per cent of the value of the tip credit and misallocated tips at issue. From the net settlement fund (the Qualified Settlement Fund less the amounts described above), Analytics Consulting will pay each collective member a minimum payment of $100 plus a pro rata share based on each individual's tip credit and misallocated tip damages. In addition to the $981,000, defendants will separately pay the employer's share of payroll taxes. The settlement fund will make payments to the 507 collective members averaging $1,225 per member net of fees and expenses. The largest settlement check is nearly $5,000, and 121 workers will recover more than $2,000. Analytics Consulting will mail these payments to workers upon court approval with no claims process and no reversion to defendants of unclaimed funds. In exchange for these payments, collective members will release only those claims that

were or could have been asserted based on the facts alleged in the Complaint (Doc. #1). Further, defendants have ceased the challenged tip pooling practice.

Within 14 days after the Court approves the settlement, defendants will fund the settlement. Within 30 days of settlement approval, Analytics Consulting will issue checks directly to collective members. For purposes of settlement, the settlement payments to collective members will be treated as half wages and half non-wages. If a collective member does not deposit his or her settlement check within 120 days, the settlement payment will be paid to the unclaimed property division of the state where the collective member lives to be held on his or her behalf. No unclaimed payments will revert to defendants.

Under the settlement, collective members will release claims against defendants and their affiliates based on tip credit and tip pooling through June 17, 2025, i.e. the date the parties fully executed the agreement.

The settlement agreement allocates Perry a $10,000 service award payable from the common fund.

Plaintiffs' counsel seeks $327,000 in fees, which is one-third of the total settlement amount. Plaintiffs' counsel also seeks reimbursement of expenses totaling $1,428.06.

On June 30, 2025, Analytics Consulting distributed notice of the settlement by email to 499 collective members and by U.S. Mail to eight collective members (those for whom it had no email address).[2] The notice advised collective members of their projected settlement amounts, how the awards were calculated, the scope of the release, the amount of attorneys' fees and expenses requested, the amount of the service award requested and the parties' positions on the

---

[2] Three of the 499 email addresses were invalid, so Analytics Consulting sent notice to those collective members by U.S. Mail. None of the mailed notices were returned to Analytics Consulting as undeliverable.

claims. The notice explained that members must send any objections to plaintiffs' counsel by July 21, 2025. Neither plaintiffs' counsel nor Analytics Consulting received any objections.

Plaintiff asks the Court to approve the parties' Settlement Agreement and grant final collective certification. Plaintiff further asks the Court to appoint Analytics Consulting as the third-party settlement administrator and to authorize the following awards: (1) plaintiff's counsel's attorneys' fees totaling one third of the fund ($327,000); (2) plaintiff's counsel's litigation expenses in the amount of $1,428.06 to be paid from the fund; (3) a $10,000 service award to Perry to be paid from the fund; and (4) $19,956 for the cost of notice and settlement administration to be paid to Analytics Consulting from the common fund.

## Analysis

### I.     Final Collective Certification

As noted, the Court previously granted conditional certification of the collective. Plaintiff now seeks final certification. In making a final collective action determination, the Court considers several factors including (1) the disparate factual and employment settings of individual plaintiffs; (2) various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations. See Thiessen v. GE Capital Corp., 267 F.3d 1095, 1103 (10th Cir. 2001).

The parties ask the Court to certify a final collective action of 507 dealers who worked in various Boyd casinos. All conditionally certified class members worked under defendants' tip pool policy and their jobs as dealers were substantially similar. The employees in the collective therefore are similarly situated. 29 U.S.C. § 216(b). The factual and employment settings of individual plaintiffs favor a collective action.

As to defenses, defendants generally dispute liability as to all opt-in plaintiffs and assert

that Dual Rate Supervisors are permitted to participate in the dealer tip pool because of the nature of their roles. It does not appear that defendants assert or could assert any defense that applies only to individual plaintiffs. This factor therefore favors collective certification.

Fairness and procedural considerations—such as allowing plaintiffs to pool their resources for litigation and the policy of encouraging settlement of litigation—favor collective treatment here. Barbosa v. Nat'l Beef Packing Co., LLC, No. 12-2311-KHV, 2015 WL 4920292, at *5 (D. Kan. Aug. 18, 2015).

For these reasons and pursuant to 29 U.S.C. § 216(b), the Court sustains plaintiff's request for final collective action certification.

**II.     Settlement Approval**

Under the FLSA, parties must present a proposed settlement to the Court, which determines whether the settlement is fair and reasonable. Elston v. Horizon Glob. Ams., Inc., No. 19-2070-KHV, 2020 WL 6318660, at *4 (D. Kan. Oct. 28, 2020). To approve the settlement, the Court must find that (1) the litigation involves a bona fide dispute, (2) the proposed settlement is fair and equitable to all parties and (3) the proposed settlement contains an award of reasonable attorney's fees. Id. The Court also must determine whether plaintiff's service award is fair and reasonable. Id. If the settlement agreement satisfies these requirements, the Court may approve it to promote the policy of encouraging settlement. Id.

    A.     Bona Fide Dispute

When parties request approval of an FLSA settlement, they must provide sufficient information to determine whether a bona fide dispute exists. Id. To satisfy this burden, the parties must provide the following information: (1) a description of the nature of the dispute (e.g., a disagreement over coverage, exemption or computation of hours worked or rate of pay); (2) a

description of the employer's business and the type of work that the employees perform; (3) the employer's reasons for disputing the employees' right to the wages or overtime; (4) the employees' justification for the disputed wages; and (5) if the parties dispute the computation of wages owed, each party's estimate of the number of hours worked and the applicable wage.  Id.

Here, plaintiffs contend that defendants maintained unlawful tip pools for dealers because the pools included non-tipped, supervisory employees called Dual Rate Supervisors.  See 29 U.S.C. § 203(m)(2)(A)(ii).  Plaintiffs allege that they are entitled to damages in the form of the tip credit and return of the unlawfully distributed tips.  29 U.S.C. § 216(b).  As the parties note, the nature of plaintiffs' claims present two possible distinct results: a finding that Dual Rate Supervisors may participate in the tip pool for PTO hours accrued in their non-tipped, supervisory roles or a finding that they cannot.  Defendants argue that Dual Rate Supervisors are permitted to participate in the dealer tip pool because of the nature of their roles.  As employers, defendants bear the burden to prove that they operate a valid tip pooling arrangement and comply with all FLSA tip pool requirements.  See Montano v. Montrose Rest. Assocs., Inc., 800 F.3d 186, 189 (5th Cir. 2015) (employer has burden of establishing entitlement to tip credit which includes burden to prove it operated legal tip pool).  A genuine dispute of FLSA coverage exists in this case.  See James, 2022 WL 4482477, at *9 (Judge Crabtree found that same claims and defenses presented bona fide dispute whether defendants violated FLSA and either side potentially could prevail if case continued).  If a tip pool violates the FLSA's requirements, the employer is ineligible to claim the tip credit and is liable for the difference between its tipped employees' sub-minimum base hourly wage and the federal minimum wage and must reimburse all improperly distributed tips.  See 29 U.S.C. § 216(b) ("Any employer who violates section 203(m)(2)(B) of this title shall be liable to the employee or employees affected in the amount of the sum of any tip credit taken

by the employer and all such tips unlawfully kept by the employer"). Based on this record, the Court finds that the parties' settlement resolves a bona fide dispute.

B.    Fair And Equitable

To determine whether the proposed settlement is fair and equitable, the Court considers several factors, including the following from the class action context: (1) whether the parties fairly and honestly negotiated the proposed settlement; (2) whether serious questions of law and fact place the ultimate outcome of the litigation in doubt; (3) whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; and (4) the judgment of the parties that the settlement is fair and reasonable.  Barbosa v. Nat'l Beef Packing Co., LLC, No. 12-2311-KHV, 2014 WL 5099423, at *9 (D. Kan. Oct. 10, 2014) (citing Fed. R. Civ. P. 23(e)).  These factors, however, are not determinative; the Court must also consider factors that are relevant to the history and policy of the FLSA, such as whether the proposed agreement contains overly-broad releases or restrictive confidentiality provisions, or fails to provide recourse to opt-in members who object to the proposed settlement.  Id.

The parties substantially disagree over the merits of plaintiffs' case.  Defendants raised several arguments that, if successful, would have resulted in the collective recovering nothing.[3] Plaintiffs acknowledge that to ultimately prevail, they would have been required to take significant discovery involving casinos in several states.  The parties have shown that serious questions of law and fact place the ultimate outcome of the litigation in doubt.

It appears that the parties fairly and honestly negotiated the proposed settlement.  The

---

[3] Defendants argued that (1) no case law or legal authority suggests that tipped employees cannot share tips with other tipped employees who are on PTO, (2) the FLSA does not regulate the payment of PTO at all, (3) when Dual Rate Supervisors take PTO, they are not working in a dealer or a supervisor role because they are not working at all and (4) Dual Rate Supervisors would not qualify as managers or supervisors under Department of Labor guidance.

parties also have established that the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation. The parties settled this case during Phase I discovery. Under the settlement, collective members recover some 77 per cent of claimed tip credit damages and misallocated tips damages, with the average settlement check totaling more than $1,225.[4] Upon approval of the settlement and without a claims process, the settlement administrator will mail checks to the collective members. None of the funds will revert to defendants. At trial, collective members could possibly have recovered more through liquidated damages under the FLSA. Even so, plaintiff's counsel has made the reasonable judgment that significant settlement payments now outweigh the chance to obtain more after a trial and appeal years from now.[5] See James, 2022 WL 4482477, at *10 (immediate recovery of 76 per cent of tip credit and misallocated tip damages outweighs mere possibility of future relief after protracted and expensive litigation). The high percentage of recovery, the limited release, the direct mailing of checks with no claims process and the absence of any reversion of uncollected payments to defendants demonstrate a strong result for collective members. On this record, the gross settlement fund of $981,000 is fair and equitable.[6]

---

[4] Under the Settlement Agreement, the settlement payments to collective members are based on their pro rata tip credit and misallocated tips damages with a $100 minimum payment. Plaintiff's counsel opines that this is the most fair and equitable way to allocate the net settlement fund because it principally pays collective members for their pro rata damages while also rewarding all collective members with a nominal payment for participating in the case and giving defendants a release.

[5] Plaintiff's counsel have collectively prosecuted more than 20 casino wage and hour class and collective actions of the same or similar wage and hour claims recovering millions of dollars for these types of workers.

[6] On May 15, 2025, the Court expressed concern about the parties' statement that they had reached a "confidential" settlement agreement. Order (Doc. #36). In fact, the parties have filed a copy of the settlement agreement. The Settlement Agreement prohibits plaintiff's
(continued. . .)

C. Reasonable Attorney Fees

The FLSA requires that in addition to any judgment awarded to plaintiffs, the Court shall award plaintiffs reasonable attorney fees and the costs of the action. 29 U.S.C. § 216(b). Though the Court has discretion to determine the amount and reasonableness of the fee, the FLSA fee award is mandatory. Id.

When a settlement creates a common fund, courts apply one of two methods to determine reasonable attorney fee awards: a percentage of the fund or the lodestar method. See Rosenbaum v. MacAllister, 64 F.3d 1439, 1445 (10th Cir. 1995). The Tenth Circuit applies a hybrid approach, which combines the percentage fee method with the specific factors traditionally used to calculate the lodestar. See Gottlieb v. Barry, 43 F.3d 474, 483 (10th Cir. 1994). In all cases, the Court must consider the factors listed in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974). See Rosenbaum, 64 F.3d at 1445.

Where the parties propose a percentage of the fund approach, as they do in this case, the Court has discretion to reduce an award of attorney fees which it determines would be unreasonable under the lodestar approach. Christeson v. Amazon.com Servs., Inc., No. 18-2043-KHV, 2019 WL 4054032, at *3 (D. Kan. Aug. 28, 2019); see Wininger v. SI Mgmt. L.P., 301 F.3d 1115, 1125 (9th Cir. 2002). The percentage reflected in a common fund award must be reasonable and, as in statutory fee cases, the Court must articulate specific reasons for fee awards demonstrating the reasonableness of the percentage and thus the reasonableness of the fee award.

---

⁶(. . .continued)
counsel from publicly commenting about the settlement, but it does not restrict Mr. Perry or collective members from discussing or publicizing the settlement in any way. Cf. Elston v. Horizon Glob. Ams., Inc., No. 19-2070-KHV, 2020 WL 2473542, at *5 (D. Kan. May 13, 2020) (provision prohibiting plaintiff and class members from contacting media or responding to inquiries improper).

See Brown v. Phillips Petrol. Co., 838 F.2d 451, 454 (10th Cir. 1988).

To determine reasonableness, the Court relies heavily on the 12 Johnson factors, which are as follows: (1) time and labor required, (2) novelty and difficulty of the questions presented in the case, (3) skill requisite to perform the legal service properly, (4) preclusion of other employment by the attorneys due to acceptance of the case, (5) customary fee, (6) whether the fee is fixed or contingent, (7) any time limitations imposed by the client or circumstances, (8) amount involved and results obtained, (9) experience, reputation and ability of the attorneys, (10) "undesirability" of the case, (11) nature and length of the professional relationship with the client and (12) awards in similar cases. Rosenbaum, 64 F.3d at 1445; Johnson, 488 F.2d at 717–19.

The Court notes that when parties reach a settlement under which defendant agrees to not oppose attorney's fees that come from a common fund—which is the case here—the Court skeptically examines and analyzes the fee and cost proposal because defendant has no incentive to bargain for lower fees. Elston, 2020 WL 6318660, at *7; Hoffman v. Poulsen Pizza LLC, No. 15-2640-DDC, 2016 WL 2848919, at *4 (D. Kan. May 16, 2016).

Here, plaintiff's counsel collectively expended 210 hours but seeks an award of fees of $327,000, i.e. a blended rate of $1,557 per hour. In James, counsel requested and Judge Crabtree approved a blended rate of $367 per hour. See James v. Boyd Gaming Corp., No. 19-2260-DDC, 2022 WL 4482477, at *17 (D. Kan. Sept. 27, 2022). Counsel state that their total lodestar in this case is $160,927.50, but they do not perform a full lodestar analysis. Counsel concede that they received a fee of roughly half of their lodestar in James, but ask for a fee of twice their lodestar in this case. See Plaintiff's Memorandum Of Law In Support Of Unopposed Motion For Approval Of FLSA Collective Action Settlement (Doc. #41) filed June 27, 2025 at 24 n.8. Absent a full lodestar analysis, the Court cannot ascertain the reasonableness of the requested fee award. **On or**

**before September 16, 2025, plaintiff shall file a renewed motion for approval of the settlement agreement which includes a full lodestar analysis for the requested fee award.** In the renewed motion, plaintiff's counsel should account for the fact that although they took this case on a contingent fee basis, they did so with minimal to no risk. See Declaration Of Alexander T. Ricke (Doc. #41-1) filed June 27, 2025, ¶ 23 (since 2016, counsel litigated more than 20 casino wage and hour and class and collective actions and obtained casino wage and employment settlements exceeding $70 million). Counsel's experience in FLSA cases in the casino context and the fact that counsel litigated a nearly identical case in James suggest that a straight percentage of fund award which results in a blended rate of $1,557 per hour is not reasonable under Johnson. See James, 2022 WL 4482477, at *17 (approving blended rate of $367 per hour); Elston, 2020 WL 6318660, at *7 (approving fee award of 38.6 per cent of common fund, which resulted in blended rate of approximately $332.97 per hour). For these reasons, the Court rejects the proposed fee award of $327,000.[7]

    D.    Service Award

The parties ask that the Court approve a $10,000 service award to Mr. Perry as class representative. The Court examines any proposed service payment to determine whether it is fair and reasonable. See Enegren v. KC Lodge Ventures LLC, No. 17-2285-DDC, 2019 WL 5102177, at *7 (D. Kan. Oct. 11, 2019); Grove v. ZW Tech, Inc., No. 11-2445-KHV, 2012 WL 1789100, at *7 (D. Kan. May 17, 2012). The parties contend that Mr. Perry took a risk by representing the

---

[7] Counsel also requests expenses, which include $1,013.46 for Westlaw charges. Counsel states that in both contingency and hourly cases, his law firm does not absorb Westlaw charges into the firm's overhead and typically bills clients for such charges. Courts have approved such charges in FLSA cases. See James, 2022 WL 4482477, at *13 (approving $32,000 in Westlaw charges in addition to fee award which reflected blended rate of $367 per hour). In plaintiff's amended motion, however, plaintiff must specify how the recovery of Westlaw charges is reasonable in this case in relation to counsel's requested blended rate.

class; actively participated and assisted plaintiff's counsel in all phases of this case; and routinely fielded questions from co-workers and potential opt-in plaintiffs. According to the parties, Mr. Perry spent about 55 hours in the prosecution of this case. The parties seek a service award to Mr. Perry of $10,000, i.e. $181.82 per hour. This Court has found that $20 per hour is a reasonable incentive fee. See Elston, 2020 WL 6318660, at *11; Barbosa, 2015 WL 4920292, at *6; Peterson v. Mortg. Sources, Corp., No. 08-2660-KHV, 2011 WL 3793963, at *8 (D. Kan. Aug. 25, 2011). Under these cases, the Court reduces the incentive award to $1,100. On this record, the parties have shown no reason to increase the incentive fee by a multiple of more than nine. The Court therefore denies a $10,000 incentive fee for Mr. Perry.

**IT IS THEREFORE ORDERED** that Plaintiff's Unopposed Motion For Approval Of FLSA Collective Action Settlement (Doc. #40) filed June 27, 2025 is **SUSTAINED in part and OVERRULED in part**. **The Court sustains plaintiff's request for final collective action certification. The Court overrules without prejudice plaintiff's request for approval of the parties' collective action settlement. On or before September 16, 2025, plaintiff shall file a renewed motion for approval of the settlement agreement which includes a full lodestar analysis for the requested fee award and a $1,100 service award to Aaron Perry.**

Dated this 9th day of September, 2025 at Kansas City, Kansas.

s/ Kathryn H. Vratil  
KATHRYN H. VRATIL  
United States District Judge
